[No. 28813.    Department Two.    February 1, 1943.]

KATHRYN H. VANCE, Appellant, v. L. P. INGRAM et al., Respondents.[1]

¹Reported in 133 P. (2d) 938.

400

*Donworth, Donworth & Smith* and *Hulbert, Helsell & Paul,* for appellant.

*Lundin & Barto,* for respondents.

JEFFERS, J.—This is an appeal by plaintiff, Kathryn Vance, from a declaratory judgment entered in favor of L. P. Ingram and wife on April 9, 1942.

Plaintiff, an experienced skating rink operator, had an option to buy certain real estate located at Eighty-fifth and Fremont, in the city of Seattle. In addition, she owned equipment for a roller skating rink, such as skates, pipe organ, restaurant equipment, etc. In the summer of 1938, desiring to build a rink on the property referred to, plaintiff contacted the Reconstruction Finance Corporation, for the purpose of obtaining a loan, to be secured by a mortgage on the real estate and rink equipment. She also consulted one E. J. Beardsley, a building contractor, about the construction of the rink. On September 2, 1938, the RFC conditionally approved a loan of ten thousand dollars to plaintiff (then Kathryn Olson) to be secured by a mortgage upon the real and personal property and the personal guaranty of Mr. Beardsley. Shortly thereafter, Mr. Beardsley advised plaintiff that, on account of other construction work, he would be unable to erect the rink for her.

Sometime thereafter, plaintiff and defendant L. P. Ingram (who will be referred to as the sole defendant), a contractor of forty-one years' experience, began negotiations for the erection of a rink. Plaintiff testified that, before the execution of any agreement, defendant estimated that the building could be erected for eighteen thousand dollars. Mrs. Vance also testified that defendant wrote her a letter in which he stated that plaintiff was to put up ten thousand dollars from the RFC loan, and Mr. Ingram would put up eight

thousand dollars and erect an eighteen thousand dollar building, the eight thousand dollars to be repaid to Mr. Ingram at the rate of one hundred fifty dollars per month, plus interest.

Plaintiff was corroborated in regard to this letter by her sister, Mrs. Eva Funk, and Mr. Charles Schack. Mrs. Vance, however, was unable to produce the letter, claiming that she had inadvertently returned it to defendant, together with the license to operate the rink, which Mr. Ingram was to have extended. Plaintiff was very uncertain about the date of this letter, testifying first that it was dated either in August or September, and finally concluding that it was dated on October 4th or 9th. Defendant denied all knowledge of the letter, and denied that he ever wrote such a letter.

Following the alleged receipt of the above letter, plaintiff and defendant met with the RFC to consider the loan, and, according to the testimony of Mrs. Vance, the RFC objected to the repayment of one hundred fifty dollars a month to Ingram on his loan before the RFC loan had been retired. The parties then consulted an attorney, to see if some means could be devised to raise the money. Plaintiff at that time suggested that defendant be paid a salary of one hundred fifty dollars a month, as a method of repaying the loan. A few days later, according to plaintiff's testimony, Ingram informed her that the RFC would not consider the loan for ten thousand dollars unless he (Ingram) was a partner in the enterprise. Plaintiff testified that she was reluctant to enter into a partnership agreement, as she desired to have the business for her sons, and that she finally consented merely to facilitate the obtaining of the loan, and because she was assured by defendant that he was not interested in operating a skating rink.

A partnership agreement was executed on October 19, 1938, and provided as follows:

"MEMORANDUM OF AGREEMENT, made and entered into between KATHRYN H. VANCE (formerly KATHRYN H. OLSON), as party of the first part, and L. P. INGRAM, as party of the second part.

"In consideration of the mutual covenants it is agreed as follows:

"1. Said Ingram agrees to furnish all labor and materials in accordance with plans and specifications initialed thereon, which have been approved by the parties hereto and the Reconstruction Finance Corporation, for the construction of a skating rink on property owned by Mrs. Vance described as follows: (Description of property) situated in the county of King, state of Washington, for the agreed contract price of Eighteen Thousand Dollars ($18,000.00), of which Ten Thousand Dollars ($10,000.00) is to be paid to said Ingram as the proceeds of a loan granted by the Reconstruction Finance Company under resolution dated September 2, 1938, and if necessary to secure such loan, said Ingram agrees to guarantee the same in place of E. J. Beardsley; and said Ingram agrees to furnish the necessary amount of labor and materials to complete the said building, which is in excess of the proceeds of said loan, as his investment in the partnership business hereinafter provided for.

"2. Mrs. Vance agrees to convey to said Ingram a half interest in said property and the equipment which she now owns, subject to such mortgage, the consideration for such transfer being the financing by said Ingram of the cost of said building in excess of the proceeds of said loan. The partnership shall begin on the date of this agreement and shall continue until dissolved.

"3. For such services as the parties render to the partnership after the opening of said skating rink, they shall be entitled to draw a reasonable salary.

"4. The profits of the business shall be shared equally and all losses that may arise out of or be incurred in carrying on the business shall be borne equally.

"5. The parties shall keep accurate records and books of account relating to the partnership business and funds of the partnership shall be deposited in a partnership account in a satisfactory bank, to be withdrawn only by check signed by both parties.

"6. In case of dissolution of the partnership, each partner will make to the other a true, just and final account of all things relating to the business and in all things duly adjust the same, and after all the affairs of the partnership are adjusted and its debts paid, then all assets remaining shall be divided equally between the parties.

"7. The said skating rink shall be operated under the name of 'Vance's Skating Rink,' or other name to be subsequently agreed upon.

"DATED this 19th day of October, 1938."

On the same date, Mrs. Vance was given the following option to purchase defendant's interest in the partnership:

"You are hereby given the option to purchase my interest in the partnership and the real and personal property described in said partnership agreement, at any time during the existence of the partnership, for the sum of Eight Thousand Dollars ($8,000.00) plus interest thereon at the rate of six per cent. per annum from the completion of the building up to the date of your purchasing my interest, less any amount that you have paid me in the meantime to apply upon such purchase price."

Also, on October 19, 1938, Mrs. Vance by letter notified the RFC that she had arranged to proceed with the construction of the rink; that she was submitting plans, with specifications written thereon, which she would like to have approved before commencing building operations; that she had arranged with Mr. Ingram to be the contractor instead of Beardsley; and that Mr. Ingram would guarantee the loan.

There is direct conflict in the testimony relative to the partnership agreement. The defendant denied that

he ever told plaintiff that they must form a partnership in order to obtain the loan. Both defendant and his son Fordyce testified that Mrs. Vance started the discussion relative to the formation of a partnership, and Fordyce further stated that she urged his father to become a partner, stating that Mr. Ingram would earn more as a partner than as a contractor.

On the date of the execution of the agreement, the real estate was quitclaimed to Kathryn Vance and L. P. Ingram by plaintiff's son, who was holding legal title to the property for plaintiff. On January 10, 1939, plaintiff conveyed to defendant a half interest in the personal property.

The loan from the RFC was finally approved December 2, 1938, for eight thousand dollars rather than the original ten thousand dollars, plaintiff claiming the reduction was due to the substitution of defendant for Mr. Beardsley as guarantor. According to plaintiff's testimony, Ingram notified her of this change, and suggested that, since they would have only sixteen thousand dollars, it would be necessary for each of them to put in one thousand dollars more in order to raise the eighteen thousand dollars. A supplemental agreement was then executed, which provides:

"WHEREAS, on the 19th day of October, 1938, Kathryn H. Vance and L. P. Ingram entered into an agreement and copartnership arrangement, which among other things provided that $10,000.00 of the construction cost of a skating rink was to be funished as the proceeds of a loan granted by the Reconstruction Finance Corporation, and

"WHEREAS, the Reconstruction Finance Corporation has notified said Kathryn H. Vance that the amount of the loan approved is only the sum of $8,000.00, and

"WHEREAS, the additional $2,000.00 must be raised by the parties to said agreement,

"Now, THEREFORE, IT IS understood and agreed by and between Kathryn H. Vance and L. P. Ingram, as follows:

"That each of the parties hereto shall contribute the sum of $1,000.00 in addition to any amounts agreed upon in said agreement, dated October 19, 1938, for the purpose of supplying the difference between the original loan of $10,000.00 contemplated and the actual loan of $8,000.00 to be received from the Reconstruction Finance Corporation; said respective amounts of $1,000.00 to be furnished by the parties hereto shall be available at such times as the same is necessary to complete the buildings and skating rink contemplated by the agreement dated October 19, 1938.

"Dated this 12th day of December, 1938."

A new option, dated December 12, 1938, was given plaintiff by defendant and wife, which provides:

"You are hereby given the option to purchase our interest in the partnership (my wife joining in this agreement) and the real and personal property described in said partnership agreement, said real property being described as follows: (Description of property) at any time during the existence of the partnership, for the sum of Nine Thousand Dollars ($9,000.00) plus interest thereon at the rate of 6% per annum, from the date of the completion of the building, up to the date of your purchasing my interest, less any amount that you have paid me in the meantime to apply on such purchase price."

It was admitted that Mr. Savage, plaintiff's personal attorney, drew this instrument.

Defendant furnished a blueprint of the plans referred to in the agreement, which plans were accepted by the RFC as the basis for the loan, and the blueprint contains all the specifications made.

The loan from the RFC was not to be paid out until the building was completed, and so it was necessary during the course of the work to obtain a temporary loan from the National Bank of Commerce for three

thousand five hundred dollars. This loan was secured by a mortgage upon both the real and personal property of the partnership, and the proceeds of the RFC loan were assigned to the bank as further security.

The rink was completed and opened on March 4, 1939. On March 6th following, a note and mortgage for eight thousand dollars was given by plaintiff and defendant to the RFC, and the money was made available. In order to obtain the loan, Mrs. Vance and Mr. Ingram had, on December 19, 1938, agreed with the RFC to a schedule of compensation of two thousand four hundred dollars a year for the joint managers. Furthermore, they supplied an affidavit to the RFC signed by both of them, certifying that the rink had been completed, and that there were no outstanding liens.

On March 15, 1939, they submitted a financial statement of the partnership, showing cash on hand, $1,034.50; land, $4,500; building, $18,465; and equipment, $10,000.

About a week after the rink was opened, the skating floor began to swell and buckle. At the time of the opening, no method of heating the rink was installed, although there was testimony that the partners had been informed of the need of some method of heating. To help the condition of the floor, charcoal burning salamanders were put in and were kept going during the day. Some of the boards along the outside edge of the floor were either cut or removed to allow for expansion. These measures helped the floor. Oil heat was installed in August, 1939, and this also helped the floor, but all the swelling was not removed. The condition of the floor has been a source of dispute between the parties, plaintiff claiming that defendant failed to properly construct it, while defendant claims that the condition of the floor is due to plaintiff's desire

to open the rink on March 4th, which necessitated laying the floor on the concrete before it was sufficiently dried out, and also to the refusal of plaintiff to install any heating system to dry out the floor.

Other defects are claimed by plaintiff, such as poor condition of the side walls, through which it is contended the rain comes. These claimed defects will be discussed more in detail later.

Despite the claimed defects in the floor, the rink has proved to be a success. Not only have improvements been made, but the eight thousand dollar loan from the RFC has been reduced to three thousand two hundred dollars, and over five thousand dollars have been accumulated. Furthermore, during the three years of operation, defendant has received in monthly payments a total of over four thousand dollars. Plaintiff has also withdrawn a salary for her management of the rink.

Plaintiff desired to exercise her option to buy defendant's interest. Defendant at no time since the completion of the rink has accounted to plaintiff as to the cost of construction, nor did he give this information to the accountant employed by the partnership. A controversy arose as to the amount to which defendant was entitled, and to the interpretation to be given the agreement. Plaintiff then brought this action for a declaratory judgment, praying that the transaction herein described be held to have created between the parties the relationship of debtor and creditor with respect to any advances made by defendant in connection with the construction of the rink; that defendant be required to account to plaintiff for the application of the proceeds of the RFC mortgage and the temporary loan obtained from the National Bank of Commerce; that defendant be required to furnish plaintiff a statement showing the items of con-

struction cost, if any, which were advanced by him on constructing the building; that specific performance of the option of December 12th be decreed upon plaintiff's paying into the registry of the court the amount found to be due and owing by plaintiff; and for such other and further relief as to the court shall seem just and equitable.

From a judgment declaring that plaintiff and defendant are, and since October 19, 1938, have been, equal partners in the property and business known as Ridge Skating Rink, that no relation of debtor and creditor exists between them, that no payment has been made by plaintiff to defendant on account of the purchase of defendant's partnership interest, and dismissing the action, plaintiff has appealed.

Appellant assigns error on the part of the trial court in construing the original agreement of October 19, 1938, and the supplemental agreement of December 12, 1938, as not obligating respondent to construct an eighteen thousand dollar building, and to furnish the necessary funds therefor in excess of the proceeds of the RFC loan; in construing the option dated October 19, 1938, as amended by the option dated December 12, 1938, as requiring appellant, in order to exercise the option, to pay respondent nine thousand dollars, plus interest, regardless of the amount of money respondent contributed to the partnership capital, without any credit being allowed for the amounts which respondent has received from the partnership. Error is also based on the following findings made by the court:

"Thereafter the defendant L. P. Ingram advanced the sum of $1,000 as provided in the supplemental agreement of December 12, 1938 and proceeded with the construction of the skating rink."

"On or about December 12, 1938, plaintiff took the agreement [agreement of Oct. 19, 1938] and the letter

[first option of October 19, 1938] set forth in paragraphs III and IV of these findings to her then attorney; and said attorney redrafted said letter and it was thereafter signed and acknowledged by the defendants."

Error is also assigned on the finding that the building was erected in accordance with the plans and specifications agreed upon by the parties and approved by the RFC.

This controversy concerns the interpretation to be given to the original agreement, the supplemental agreement, and the two options.

In an endeavor to present this matter as clearly as possible, we shall set out appellant's theory, as we understand it, and then discuss the different phases of the case in more detail.

Appellant first contends that respondent, by the agreement, contracted with appellant to furnish labor and material for a building, at an agreed contract price of eighteen thousand dollars, of which nine thousand dollars was to be his contribution to the partnership capital; second, she contends that the option agreement was executed to provide a method of repaying respondent for his capital contribution, and he should be entitled only to the amount actually contributed, since the instrument as between the parties was merely a method to secure the loan from Mr. Ingram; third, appellant contends that the amount which respondent has received from the partnership during its operation must be credited against the amount found to be due under the option agreement.

The real question for the court to determine, then, is what the partners intended by the agreement which they executed.

It is a well-established rule of construction that, when parties adopt a written agreement as the ex-

pression of their intentions, that instrument becomes the contract, and all negotiations and understandings previous thereto become merged into the agreement. Unless the contract as executed is ambiguous, or unless there exists some ground for rescission or reformation, the actual unexpressed intentions of the parties may not be considered to alter the terms of the written document. The fact that a party may have believed the effect of the agreement to be different than it actually is, will not, in and of itself, justify this court in setting aside or rewriting the contract for them.

It is also true that, if several instruments are executed as part of the same transaction, they should be interpreted together. 3 Williston on Contracts (Rev. ed.) 1801, § 628; *Standring v. Mooney*, 14 Wn. (2d) 220, 127 P. (2d) 401. In the instant case, we have four instruments which govern the relation of the parties: The agreement of October 19, 1938, and the option executed the same day; the supplemental agreement, and the second option. To actually understand the obligations of appellant and the rights of respondent, we must construe these documents together.

One further rule of construction should be mentioned. The court may always consider the surrounding circumstances leading up to the execution of an agreement, not to evidence an intent contrary to that expressed in the agreement, but to place the court in the same position as the parties. 3 Williston on Contracts (Rev. ed.) 1804, § 629; *Leavenworth State Bank v. Cashmere Apple Co.*, 118 Wash. 356, 204 Pac. 5.

With these general rules in mind, do the instruments, considered together, evidence an intent to create a partnership relation? As we understand appellant's contention, as to third parties appellant

and respondent were undoubtedly partners and liable as such, but as between themselves they occupied a debtor-creditor relation.

To support this position, appellant has cited cases from this state where deeds with options to repurchase have been construed to be mortgages rather than absolute deeds. Therefore appellant states:

"We see no difference between such a situation and the present, where the object of the property owner was to secure the building contractor for the amount of money which he himself put into the building together with 6% interest from date of completion."

In the case of *Yatsuyanagi v. Shimamura*, 59 Wash. 24, 109 Pac. 282, this court said:

"The essential test in determining the partnership relation, is whether the parties intended to establish such a relation; and that, as between themselves, this intention is to be determined by their express agreement, or inferred from their acts and conduct."

See, also, *Constanti v. Barovic*, 199 Wash. 117, 90 P. (2d) 724; *Stipcich v. Marinovich*, 13 Wn. (2d) 155, 124 P. (2d) 215.

The provisions of the agreement of October 19, 1938, and the supplemental agreement, such as the showing of profit and losses, together with the contributions of both appellant and respondent in the common venture of constructing and operating a skating rink, evidence an intent to create a partnership. The fact that one partner gave to the other an option to buy his interest, and thus terminate the partnership, is not inconsistent with the theory that they were partners. Such rights have been recognized by the courts. *Corr v. Hoffman*, 256 N. Y. 254, 176 N. E. 383, in which an option was held to apply even to a partnership at will. An option simply provides a method by which one party may continue his control and ownership of the

entire business. The fact that in the instant case the option was given solely to appellant does not negative the theory of partnership. Appellant was an experienced rink operator; she was interested in the business, and desired to have complete control of it. Therefore, it seems to us it is logical that she was the one who desired the right to purchase from respondent all of his interest, and continue the rink operation alone.

Furthermore, the conduct of the parties has been entirely consistent with the provisions of the agreement. They have used partnership income tax returns for the period of the operation; they have contracted obligations as a partnership; they have employed an accountant who issued to both of them statements as to the success of the business; joint bank accounts are maintained, and all checks require the signature of both parties.

In order to hold that the legal status of these parties is not that of partners, but something more like a debtor-creditor relation, it would be necessary to disregard the express agreement, and, by resorting to parol evidence, attempt to determine the unexpressed intentions of the parties. However, as the parties adopted the contract of October 19th as the expression of their agreement, the relationship between the parties is to be determined by that contract, and parol evidence will not be admissible to show a contrary purpose, unless there exists some ambiguity in the agreement. 40 Am. Jur. 141, Partnership, § 25.

We do not feel that the mortgage cases cited by appellant are applicable to the situation here presented, since they are clearly exceptions to the parol evidence rule, and since appellant has cited no authority nor assigned any reason for the extension of that doctrine to this type of case. The appellant, in our opinion, is

bound by the general rule which prevents a showing of an intent inconsistent with the intention expressed in the adopted agreement. It thus becomes unimportant that appellant first desired to merely borrow the money from respondent, and repay him at the rate of one hundred fifty dollars a month. Even if this were the understanding, which is disputed, it is of no avail now, as the litigants agreed to become partners and to adopt the contract as expressing the relationship between them. We therefore cannot arbitrarily disregard the written instrument and determine that actually respondent was merely a creditor, secured by this rather unusual device. The fact that the court may consider the surrounding circumstances also is of no aid to appellant, since, as noted earlier, while these facts may be considered, they may not be used to establish an intent contrary to that expressed in the written document.

Our main problem, then, is to determine the proper interpretation to be given these instruments. Going to the issue raised by the first assignment of error, was respondent obligated to construct a building costing eighteen thousand dollars, or was he required to erect a building which complied with the plans as adopted by the parties? The conflict arises because, in paragraph one of the agreement of October 19th, there is a reference to a building with an agreed contract price of eighteen thousand dollars, followed by the provision that Ingram *agrees to furnish the necessary amount of labor and materials to complete the building, which are in excess of the loan procured by appellant.*

There is some contention by appellant that the plans being so sketchy and without adequate specifications, unless respondent had a duty to expend eighteen thousand dollars, there would be no control over the type

of building which he might erect; that is, he could use inferior materials and substantially alter the building from that which the parties intended, although still complying with the general requirements of the plans. This contention is without merit. Both parties adopted the plans as drawn, and they also received the approval of the RFC. Although perhaps the specifications could have been more detailed, the fact that the parties did not feel it necessary to expend additional money to procure such specifications does not compel the conclusion that the rink was to be a building that cost eighteen thousand dollars.

Respondent, at the time of the partnership agreement, estimated that he could erect a building according to the submitted plans for eighteen thousand dollars. At that time, both parties accepted that as a fair evaluation of the construction cost. There is no showing that respondent knew he could erect, or expected to erect, a rink for any lesser sum. Appellant was anxious to obtain a building suitable for a skating rink; respondent supplied her with plans for such a building, and appellant accepted his terms. The object which she desired was the erection of a building complying with the plans. The fact that the parties estimated the construction cost to be eighteen thousand dollars was purely incidental. This figure was accepted as an evaluation, or estimate, based on presumed costs. As of October 19th, appellant and respondent determined that respondent's contribution to the partnership capital would be all the material and labor over and above the loan from the RFC. In order to determine their respective interests in the business, the parties evaluated this contribution at eight thousand dollars, since they assumed that the building would cost eighteen thousand dollars.

■ At the most, there was a conflict between these provisions of paragraph one, and in such a case the rule is that effect will be given to that provision which more nearly effectuates the purpose of the entire contract. 3 Williston on Contracts (Rev. ed.) 1795, § 624. Since we are of the opinion that the purpose was to erect a skating rink in accordance with the plans referred to in the agreement, and approved by the parties, rather than simply an eighteen thousand dollar building, the duty placed upon respondent was one of complying with the plans. If the building could not have been erected for eighteen thousand dollars, respondent's obligation would still have existed, and as between the parties, his contribution would still be evaluated at eight thousand dollars. Therefore, if respondent has erected a building which substantially complies with the plans which he had drawn, he has performed his part of the agreement.

Nor do we believe that the supplemental agreement makes this interpretation fallacious. Appellant points to the following words of the supplemental agreement, referring to the agreement of October 19th: "which among other things provided that $10,000.00 of the construction cost" was to be paid by the RFC loan. The construction cost, appellant contends, can only refer to the eighteen thousand dollar cost of the building, which shows that the parties intended that this amount be expended. We feel, however, that this agreement is equally consistent with the theory that the parties assumed that the cost of erecting a building according to the plans would be eighteen thousand dollars. Therefore, when the loan was reduced to eight thousand dollars, an additional two thousand dollars was necessary, not to build an eighteen thousand dollar rink, but to enable respondent to erect one in compliance with the plans. The option agreement

was then increased to nine thousand dollars, eight thousand dollars being the estimated value of services and materials which respondent was originally required to supply, and one thousand dollars the amount which he was to contribute under the supplemental agreement. In our opinion, the trial court committed no error when it determined that the duty of respondent was to erect a building according to the plans. Therefore, even assuming that the building was erected for less than eighteen thousand dollars, since there is no showing that respondent attempted to defraud appellant or take advantage of her in any way, we feel that he has fulfilled his obligation if he has substantially complied with the plans.

Nor has it been conclusively established that the building did cost less than eighteen thousand dollars. Appellant attempted to determine the cost of construction by obtaining statements of cost from the various parties who had supplied material, and by checking the payroll returns to the department of labor and industries. The total cost so figured was $9,572.72, although there is no showing that all costs were figured in. A. M. Young, called by appellant, estimated the cost at ten thousand dollars, and testified that fifteen per cent, or one thousand five hundred dollars, should be added for the contractor's overhead and profit, making a total cost of eleven thousand five hundred dollars. On the other hand, Harold L. Bean, called by respondent, appraised the building for the RFC, and testified that he had estimated the cost at $19,465, although respondent had informed him that the building cost materially less than that amount. John Hudson, also an appraiser called by respondent, testified that in his opinion the building cost $18,600. Respondent did not testify as to the cost of the building, con-

tending that he had destroyed records of the cost, and he had no independent memory of the amount actually expended.

While it is perhaps true that the building did not cost eighteen thousand dollars, and while respondent's inability to testify as to the cost of the building may seem a little strange, yet in view of the further fact that at the time of the trial some three years had passed since the building was completed, we are not prepared to say his testimony cannot be accepted as true.

Neither are we able to say that the testimony of Mr. Young, that in his opinion the building should not have cost more than eleven thousand five hundred dollars, is convincing. In order to grant the loan of eight thousand dollars, the RFC required that the cost of the building was to be not less than fifteen thousand dollars. The RFC representatives saw and inspected the plans, and its appraisers passed upon the cost of the building. Thereafter the loan was made. It is difficult for us to believe that this corporation, which makes so many loans, would have sanctioned a loan of eight thousand dollars on an eleven thousand five hundred dollar building.

It is next claimed that the trial court erred in interpreting the option agreement. Appellant contends that, under this agreement, respondent is entitled to receive only the amount he actually contributed to the partnership capital, and that appellant should be entitled to a credit for the amount which respondent has received from the operation of the rink.

Reading these options alone, it cannot be contended that they are ambiguous as to the total amount to be paid for respondent's interest. They clearly provide that eight thousand dollars and nine thousand dollars,

respectively, must be paid to purchase the interest of respondent. Appellant contends that the sole purpose of these options was to provide a method of repaying respondent for his contribution to the partnership capital, and that the figures were arrived at by subtracting the amount of the RFC loan from the cost of the building.

We are of the opinion that the option agreement clearly obligated appellant to pay nine thousand dollars in order to exercise her option. The agreement is not ambiguous, and, even when construed in relation to the other instruments, there is no indication that the amount which respondent was entitled to receive was in any way conditioned upon the amount respondent was actually to contribute. Nine thousand dollars was agreed upon as the evaluation of respondent's interest, and we cannot examine extraneous circumstances or parol evidence to establish a contrary intention. *Lefebure v. Henry Lefebure Sons Co.*, 202 Iowa 1053, 207 N. W. 853; *Kavanaugh v. Johnson*, 290 Mass. 587, 195 N. E. 797.

Appellant also presents the additional argument that, even assuming the option price is nine thousand dollars, she is entitled to credit for the amount which respondent has been paid from the partnership. This contention is based on the clause in the option, "less any amount that you have paid me in the meantime to apply on such purchase price." This provision seems to us to be clear and unambiguous.

For several months after the rink opened, respondent received $37.50 a week, and this was later reduced to twenty-five dollars a week. Appellant also received a salary for the management of the rink. Appellant states that this amount which respondent received, totaling over four thousand dollars, must be credited on the option price, as both parties knew that appel-

lant had no other sources of income from which to make the payments, and further, respondent rendered no services in the operation of the rink justifying payment of a salary. Appellant further contends that, since respondent received interest on his capital investment under the option agreement, it would be unjust to allow him $37.50 or twenty-five dollars a week in addition.

There are no facts which justify the conclusion that this amount was received by respondent as payments on the option price. The only evidence of any payment was a statement by Mrs. Vance that she paid Ingram forty dollars, stating that this was her first repayment to him under the contract. This the respondent denied. The trial court found that appellant had *not paid respondent any sum to apply upon the option.* While this, being an equity case, is tried *de novo,* and while the court is required to read the entire record and determine for itself what findings should be made, if the trial court has made findings, and if the evidence is conflicting or appears to be evenly balanced, the findings of the trial court will not usually be disturbed. *Columbia Lbr. Co. v. Bush,* 13 Wn. (2d) 657, 126 P. (2d) 584. At most, the evidence in respect to this matter is conflicting. In fact, appellant could not point to any direct fact to sustain her position, but relied entirely upon the conclusion which she felt could justly be drawn from the related conduct of the parties.

In connection with the interpretation of this clause of the option, appellant has argued that, if respondent is entitled to nine thousand dollars, plus interest, and also the four thousand dollars, he will be unjustly enriched, even assuming that he did pay in the nine thousand dollars. The enrichment, of course, would be greater and more extreme if respondent's contribution to the partnership was considerably less

than nine thousand dollars. In any event, it is argued that the parties could not have intended that respondent should receive such a profit from the venture.

The amount of the return finally received by a contracting party is not the only factor to be considered in a case of this kind. There are in addition the factors of risk, the security involved, the probability of repayment, the amount of money invested, the newness of the business. In this case, appellant had very little financial backing; she had to borrow all the funds necessary to proceed with the building. She needed not only a contractor, but someone who would be willing to invest his money in the enterprise with no assurance of its success. This respondent was willing to do, and, in addition, he became the guarantor of the RFC loan, and he signed the note for one thousand dollars to enable appellant to procure this additional amount when the RFC loan was reduced to eight thousand dollars. While now that the enterprise has proved successful it appears that respondent may have obtained a good bargain, the uncertainties which existed in 1938 are the factors which must be considered in determining the extent of the return. *Keith v. Rust Land & Lbr. Co.*, 167 Wis. 528, 167 N. W. 432; *Causten v. Barnette*, 49 Wash. 659, 96 Pac. 225. We do not feel that there is a sufficient showing of lack of consideration on the part of respondent to justify a different interpretation of the agreement.

Because of the holding previously indicated, that respondent was not obligated to contribute any fixed amount, but rather the cost of materials and labor over and above the RFC loan, appellant's argument that she is entitled to an offset against the option price, because of respondent's failure to contribute nine thousand dollars, need not be considered.

Finally, there is the question, as to whether

respondent actually erected a building which substantially complied with the plans. The trial court found there was substantial compliance. Appellant maintains that there were two material defects in the building; first, the condition of the floor, and, second, the construction of the side walls through which it was possible for water to come. As to the condition of the floor, there is no question but that it swelled and is warped, but there is a conflict as to the cause of this condition. Respondent himself testified that the moisture which contributed to the bulging of the floor was due to laying the floor on damp concrete, preventing his properly mopping it with asphalt. The necessity for hurrying, he contended, was due to appellant's advertising the opening date as March 4, 1938, causing him to work during poor weather conditions. The failure to provide for a system of heating also materially contributed to the condition. Mrs. Vance maintains, however, that the plans were defective, because they did not provide for a heating plant, which was necessary to keep the humidity of the rink constant. She contends that respondent, as the contractor, should be liable for this defect in the plans.

There was testimony that Ingram, at the time he worked on the plans, suggested to appellant that a heating system should be installed, and that appellant refused to provide for one, feeling that the expense was too great, and that a rink needed to be cool. Also, Harold Ingram testified that he informed Mrs. Vance and his father that a heating plant was essential. We are of the opinion that the condition of the floor may be equally attributed to appellant and respondent. Not only was appellant an experienced rink operator, knowing the necessity for a good floor, but, if the testimony be believed, she also received information of the need for a heating plant.

The case of *White v. Mitchell,* 123 Wash. 630, 213 Pac. 10, cited by appellant, we believe is distinguishable, as there was no showing in the cited case that the owners of the building had any special knowledge which would make them qualified to form an independent judgment. Furthermore, there seems to us to be a distinction between a contractor's liability for adequate drainage to prevent the foundation of a building from sagging, and the liability to provide for a heating system to prevent damage to properly laid floors. The plans did not provide for a heating system, in the instant case.

As to the other defects claimed by appellant, we do not feel they are entitled to any detailed discussion. The building was accepted by the RFC. Mr. Hudson testified that the building substantially complied with the plans, although it is true that Mr. Young did point to a number of instances which he felt showed deviation from the plans. We have the finding by the trial court that the building was erected in accordance with the plans adopted by the parties. As previously noted, while we are not bound by the findings of the trial court in an equity case, where the evidence is in conflict, considerable weight will be given to such findings. Under the evidence here, we are convinced that the finding of the trial court was proper.

We do not feel that it is necessary to consider separately the other errors assigned.

After an examination of the record, we are satisfied the judgment of the trial court is right, and must be and is affirmed.

MILLARD, STEINERT, BLAKE, and ROBINSON, JJ., concur.

April 26, 1943. Petition for rehearing denied.