[No. 31661. Department One. August 30, 1951.]

E. M. SKAUG, JR., *Respondent*, v. E. D. GIBBS *et al., Appellants.*[1]

[1]Reported in 235 P. (2d) 154.

*Thomas I. Oakshott*, for appellants.

*Powell & Nethercutt*, for respondent.

DONWORTH, J.—This action was brought to recover damages arising out of the breach of a lease and option agreement covering certain unpatented mining claims in Pend Oreille county. A trial was had before the court sitting without a jury. The court took the matter under advisement and later filed a memorandum opinion holding in favor of plaintiff. Defendants' motion for reconsideration or, in the alternative, for a new trial was denied and the court made findings of fact and conclusions of law in which it found that plaintiff was entitled to damages in the amount of fourteen thousand dollars. From a judgment entered against them in this amount, defendants have appealed.

In their amended answer, appellants admitted the execution of the agreement and their failure to perform it and alleged that they had paid into the registry of the court $4,025, which they tendered in full satisfaction of all liability arising out of the agreement. They affirmatively alleged that they had expended $500 in a survey and mineral examination of the premises. It was further alleged that the reason that the work called for by the agreement had not been performed was that the managing partner had been seriously ill shortly before the time expired for the work to be performed. As an alternative to the tender of $4,025, appellants asked that they be permitted to perform the work required by the agreement.

Respondent's reply put in issue the material affirmative allegations of this answer except that the payment of $4,025 into court was admitted.

The vital question presented is the proper construction to be placed upon the agreement. In considering this problem we should have in mind not only the language used by the parties in drafting the instrument but also the circumstances surrounding its execution so that the court

may be placed in the same position as the parties. *Vance v. Ingram,* 16 Wn. (2d) 399, 133 P. (2d) 938.

Respondent owned five unpatented mining claims in the Metaline Mining District known as Lucky Strike No. 1 to No. 5, inclusive. About twenty-five years before the agreement was signed, a tunnel about six feet by four feet had been constructed for a distance of two hundred feet. More recently, a shaft[a] (the dimensions of which are in dispute) had been sunk at an angle of seventy degrees for a depth of between ninety and one hundred feet. At the time of the trial, this shaft was filled with an accumulation of water to within eighteen feet of the entrance. The evidence indicates that the tunnel was not connected with the shaft. No ore in paying quantities had ever been removed from the property and it was what is called a "prospect."

Appellants were partners doing business under the name of Bonanza Lead. Gibbs, the managing partner, had been engaged in mining for more than forty years. He went on the property and examined it before signing the agreement. He examined both the tunnel and shaft. On the surface, there was an outcropping of gossan, which is a residual deposit resulting "from the chemical alteration of prime minerals." In this instance, the gossan consisted of sulphide of iron with arsenic associated, which frequently indicates the presence of ore deposits below the outcropping.

Appellant Gibbs, who was an interested witness, testified regarding his inspection of the property and his idea for its development:

"Mr. OAKSHOTT: Q. Tell what else you did. WITNESS: A. Well, we were trying to find some peacock copper that was supposed to be on the dump and that was supposed to come out of this shaft. We understood diamond drilling had penetrated—. Mr. POWELL: I object to what they understood. Tell what you did. WITNESS: That was the reason for deciding—. Mr. POWELL: I move to strike the answer. WITNESS: To sink the shaft fifty feet to get through the cap of iron and see what was under it. That was the only object,— to see if there was anything underneath the iron capping. Mr. OAKSHOTT: Q. What about tunneling? WITNESS: A. Well, the tunnel was to go ahead, to get underneath this outcrop-

ping of gossan out there. Q. It was a continuation of the tunneling, with proper turning at wherever it was needed, to penetrate underneath that outcropping of gossan? A. Yes, sir."

He also stated that the agreement was first drafted by his then attorney and redrafted by respondent's attorney.

The agreement, in which respondent was designated as the lessor and appellants were designated as the lessees, was executed by the parties August 21, 1948. It is too long to quote in full, but the particular portion to be construed is contained in paragraphs 2, 3 and 4, reading as follows:

"2. Lessees shall have the right of possession to said mining claims, premises and property beginning September 1, 1948, and may continue in possession and may carry on exploration and/or development work, mining, milling and reduction operations thereon or in connection therewith, with the right of working upon said claims and conducting mining operations thereon in such manner as they shall see fit, with the right to sell and dispose of all ore and products therefrom as herein provided; provided however, that all work must be done in a good miner-like manner with due regard to the safety, development and preservation of the said mining claims and premises as a workable mine. They shall perform all required assessment work in the name of the lessor. They shall keep said mine and premises sufficiently timbered where timbering is in accordance with good and safe mining. Said right to possession and operation shall continue so long as the lessees shall not be in default in any of the terms of this agreement.

"3. The lessees agree to enter upon said premises and within one year from and after September 1, 1948, to sink the present shaft an additional 50 feet or more and to construct at least 200 feet of cross-cut or drifts, or the equivalent of that amount of work, and to furnish and to pay for all material necessary to complete that work. Said lessees shall also have the right and privilege of conducting and carrying on any other exploration or development work they may desire to carry on during said year.

"4. On or before September 1, 1949, and on or before September 1st of each year thereafter, the lessees shall give the lessor written notice either of the abandonment of this agreement, or of the intention of lessees to continue under the terms and conditions thereof. If no such notice is given, this lease shall be deemed to be abandoned and shall there-

upon terminate. In the event the lessees abandon said property they shall have the right and privilege of removing therefrom all machinery, equipment, structures and/or other property placed on said premises by lessees; said property to be removed within 60 days from and after the date of such abandonment. Lessees shall have the right to high grade such property until they have been reimbursed for the cost of their development and exploration work on said premises. The notice above referred to may be given by registered letter addressed to the lessor at 5003 N. Calispel, Spokane, Wash., or may be personally served on said lessor."

There was a further provision to the effect that, after appellants had reimbursed themselves for the expenses incurred for the work performed prior to September 1, 1949, the balance of the net profit from the sale of ore and minerals should be divided seventy per cent to appellants and thirty per cent to respondent.

Appellants were granted the right to sell the property under certain restrictions and in the event of a sale respondent was to receive forty per cent of the proceeds.

Appellants admitted that they had failed to comply with the provisions of paragraph 3 regarding the work to be done by them on the property prior to September 1, 1949. No notice of intention to either abandon or continue with the agreement was given by appellants as required by paragraph 4, so the agreement terminated on that date.

At the trial, respondent's experts, basing their estimates of the cost of doing the work described in paragraph 3 upon the assumption that the contract called for two hundred feet of cross-cuts or drifts to be driven from the bottom of the shaft after it was sunk an additional fifty feet, testified to figures ranging from $12,000 to $15,313.30. These estimates contemplated the use of mechanized equipment such as a mucking machine.

Appellants' experts (for this purpose we disregard the testimony of appellant Gibbs), basing their estimates upon the assumption that the two hundred feet would be added to the existing tunnel and that the shaft would be sunk an additional fifty feet, testified to figures ranging from $3,800

to $5,500. These estimates contemplated doing much of the work by hand.

The trial court held that respondent's construction of the agreement was correct and accepted the testimony of respondent's expert witnesses. Accordingly, it entered its finding No. 7 reading as follows:

"That the reasonable cost and expense of doing the work provided for in paragraph 3 of said agreement is the sum of $14,000.00, and by reason of the failure of the defendants to do said work, plaintiff has been damaged in the sum of $14,000.00."

Appellants' first three assignments of error attack this finding. The remaining two assignments relate to the entry of the judgment and the denial of appellants' motion for a new trial.

Each party, in his brief, vigorously asserts the lack of qualifications, the partiality, and limited experience of the expert witnesses called by the opposing party and extols the qualifications, impartiality, and breadth of experience of his own experts. The estimates of the various witnesses are analyzed in considerable detail and inferences are drawn therefrom by respondent supporting finding No. 7 and by appellants indicating that the evidence preponderates against that finding.

We do not find it necessary to analyze in detail the estimates of the several expert witnesses because we are of the opinion that the trial court erred in its construction of the agreement. Consequently, it must be held that the making of finding No. 7 was erroneous for the reasons stated below.

The agreement, in substance, gave appellants the right of possession of these mining claims to

" . . . *carry on exploration* and/or development work, mining, milling and reduction operations *thereon or in connection therewith, with the right of working upon said claims* and conducting mining operations thereon *in such manner as they shall see fit.*" (Italics ours.)

This language is followed by the proviso

". . . that all work must be done in a good miner-like manner with due regard to the safety, development and preservation of the said mining claims and premises as a workable mine."

The only specific work required to be performed by appellants on the premises prior to September 1, 1949, was

". . . to sink the present shaft an additional 50 feet or more and to construct at least 200 feet of cross-cut or drifts, *or the equivalent of that amount of work.*" (Italics ours.)

Respondent argues, and his experts testified, that appellants were required to construct the two hundred feet of cross-cuts or drifts *from the bottom of the shaft* after it was sunk an additional fifty feet or more. They testified that otherwise it would be a waste of money to sink the shaft. All the testimony of respondent's experts is based on that assumption.

█ As we read the agreement, there was no such obligation resting on appellants. If such were the intention of the parties, the agreement should have explicitly so provided. No such provision was included and none can reasonably be implied. The agreement gave appellants the right to work the claims in such manner as they saw fit as long as the work was done "in a good miner-like manner." This latter phrase has no bearing on the question *where* the cross-cuts or drifts or equivalent work shall be constructed. The only specific requirement was to sink the shaft an additional fifty feet and construct the equivalent of two hundred feet of cross-cuts or drifts. The latter could be located wherever on the premises appellants saw fit to do such exploration work as long as due regard was had to the safety, development and preservation of these claims. Furthermore, appellants were free to decide whether to do the work by employing miners themselves or by letting a contract. If they elected the former course they could adopt such method as they saw fit, either using a mucking machine or picks and shovels.

■ The proper measure of the damages sustained by respondent is the reasonable cost of constructing two hundred feet of cross-cuts or drifts (or equivalent work) in such manner as a reasonably prudent miner would conduct such exploration operations. In addition, respondent is entitled to the reasonable cost of sinking the existing shaft an additional fifty feet.

We, therefore, hold that the trial court was in error in finding that the reasonable cost of doing the work required by paragraph 3 of the agreement was fourteen thousand dollars and in awarding respondent judgment in that amount.

In view of the necessity for a retrial of this case, there is another matter that should be mentioned. Appellants assert that the size of the existing shaft is eight feet by four and a half feet. Respondent contends that it measures twelve by seven feet. This difference is important in computing the cubic yardage of material to be removed. Why there should be this difference in measurements is difficult to understand. Accurate measurements should be definitely ascertainable. Unless the parties are able to stipulate as to these measurements, it is suggested that the trial court employ an independent engineer to measure the size of the existing shaft and tax one-half of his compensation and expenses to each party. Appellants' obligation under the agreement was to sink the existing shaft an additional fifty feet keeping it at the same width and breadth.

The judgment is reversed with instructions to grant appellants' motion for a new trial.

SCHWELLENBACH, C. J., BEALS, HILL, and FINLEY, JJ., concur.