[No. 32449. Department One. November 17, 1953.]

THOMAS LEE KELLY et al., *Respondents*, v. VALLEY CONSTRUCTION COMPANY, *Appellant*.[1]

[1]Reported in 262 P. (2d) 970.

*Elliott, Lee & Thomas* and *Edward J. Crowley,* for appellant.

*R. Max Etter* and *Robert L. Bell,* for respondents.

WEAVER, J.—This is an action for damages arising from an alleged breach of contract. The case was tried to the court. Defendant appeals from a judgment against it.

Appellant makes twenty assignments of error, which fall into four classes: (1) twelve assignments directed to the findings of fact (the findings of fact contain fourteen paragraphs); (2) three assignments directed to the conclusions of law; (3) three assignments directed to the denial of post-trial motions and entry of judgment (the second and third categories are dependent upon the first); and (4) the nineteenth and twentieth assignments of error are directed to the admission and consideration of certain testimony.

The length of the record, the nature of the assignments of error, and counsel's method of approach require that we consider the scope of our review. In *Peterson v. Schoonover,* 42 Wn. (2d) 621, 622, 257 P. (2d) 209 (1953), we said:

"There is a legion of our decisions stating that this court, being an appellate court and *not the trier of facts,* will not disturb a finding of the trial court unless we can say that the evidence preponderates against it. Our first duty is not to resolve a conflict of fact—that is the province of the trial judge. Our primary duty is to decide whether the opposing evidence exceeds in weight the evidence supporting the finding. If it does exceed in weight, then it can be said that the opposing evidence preponderates, and it is from the opposing evidence that a different finding springs."

See, also, *Rettinger v. Bresnahan,* 42 Wn. (2d) 631, 257 P. (2d) 633 (1953).

With this in mind, and being cognizant of the trial judge's statement that:

"In arriving at my appraisement of the evidence in this case, I am required to state for the benefit of counsel that I feel the witness Adams was mistaken in all of his testimony, except insofar as he was corroborated by other witnesses,"

we set forth the following as the facts necessary to a decision which are established by a preponderance of the evidence.

Appellant had contracted with the city of Spokane to construct a division of a new sewer system. It required 4,820 lineal feet of tunnel construction, fifty-five feet below the surface. The completed sewer was to have an inside diameter of six feet, with a one-foot concrete wall.

May 5, 1950, appellant and respondents entered into a subcontract. Respondents were to furnish and supervise the labor necessary to drive the tunnel. Since this action must be determined by an application of the facts to the written subcontract, it is necessary to set forth the pertinent provisions at some length.

"2. That subject to said prior approval the General Contractor does hereby sub-let to the Sub-Contractor the following portion of said Contract work, to-wit:

"Furnish and perform all labor as may be required to complete the tunnel . . . approximately 4820 lineal feet (excluding the two shafts and the small portion of the tunnel heretofore driven by the General Contractor, and excluding the concrete lining of the tunnel). The term labor, as herein used, shall include the full cost and expense of salaries or wages of all workmen, foreman and superin-

tendents employed by the Sub-Contractor on the job, and all costs incidental thereto . . . and premiums on public liability and property damage insurance and contingent liability and contingent property damage insurance protecting the City as required of the Sub-Contractor in said Contract, and in addition all rentals to be paid for the use of mucking machines used by the Sub-Contractor on the job. .

"The General Contractor shall furnish all materials, machinery (other than mucking machines), equipment and all electric power and water as may be required by the Sub-Contractor in the performance of this Sub-Contract. . . .

"4. The Sub-Contractor agrees to enter promptly upon the performance of said Sub-Contract work and to pursue the same diligently and continuously without any unnecessary delay and without hindrance to the General Contractor or any other Sub-Contractor, and the General Contractor and the Sub-Contractor mutually and reciprocally pledge to one another full cooperation and coordination of effort subject to all further terms of this Sub-Contract. The Sub-Contractor agrees to complete the performance of said work within two hundred days from the date of commencement.

"5. . . . the General Contractor agrees to pay for and on behalf of the Sub-Contractor all of said costs and expenses as and when the same become due, . . . and the Sub-Contractor agrees that all of said payments made by the General Contractor shall be a legal charge against the earnings of the Sub-Contractor under this Sub-Contract. It is further understood and agreed that the said THOMAS LEE KELLY and WALTER L. CLARK [respondents] . . . shall be entered upon the payroll and be paid at the rate of Twenty Five ($25.00) Dollars for each day worked.

"6. The Sub-Contractor agrees that the cost to the General Contractor for the performance of this Sub-Contract shall not exceed the sum of Thirty Three ($33.00) Dollars per lineal foot of shaft or tunnel driven by the Sub-Contractor, and further agrees to, so far as possible, reduce said cost, and in consideration thereof the General Contractor agrees to pay to the Sub-Contractor the actual cost and expense of this Sub-Contract as set forth in Paragraph 5 above, not exceeding the sum of Thirty Three ($33.00) Dollars per lineal foot of shaft or tunnel driven, plus two-thirds ($\frac{2}{3}$) of the difference between said actual cost and expense (if less than Thirty Three ($33.00) Dollars per lineal foot) and the sum of Thirty Three ($33.00) Dollars

per lineal foot, the General Contractor having the right to retain the other one-third (⅓) of such difference.

"If when the work has progressed to such point that the General Contractor can determine that the average cost for the performance of the work is exceeding Thirty Three ($33.00) Dollars per lineal foot, then the General Contractor shall have the option to terminate this agreement and take over the performance of the remaining work under this Sub-Contract, and all rights of the Sub-Contractor shall be terminated and at an end, provided, however, that if said excess cost is due to unusual conditions encountered in the performance of the work and unanticipated by both the General Contractor and the Sub-Contractor, then both parties will endeavor to mutually agree upon such additional compensation as may be just and equitable and under such unusual conditions and circumstances. . . .

"8. In the event the Sub-Contractor shall fail to promptly, diligently, fully and faithfully perform the terms of this Sub-Contract, or shall default in the performance thereof, then the General Contractor shall have the right, after the giving of five (5) days written notice of such default to the Sub-Contractor, and such default having not been made good within said five (5) day period, to discontinue and terminate this Sub-Contract, and, if necessary, take over and complete the work of the Sub-Contractor either by General Contractor's own men and methods or by the employees of the Sub-Contractor on the job, and to have the right to recover from the Sub-Contractor any loss, expense or deficiency which may be incurred by the General Contractor over and above any sum earned or to have been earned by the Sub-Contractor in the full completion of this sub-contract."

Before continuing with the facts, we set forth the following definition of terms, as used in the record, not as accurate definitions for the engineering profession, but simply as a layman's description to aid in understanding the facts of this case.

The "shaft" is the excavated area from ground level to the top or crown of the proposed tunnel.

The "station" is the area at the bottom of the shaft from the subgrade of the tunnel to its crown, and which extends to the edges of the shaft.

The "portal" is an opening entrance way to the digging area.

The "tunnel" is the area at the bottom of the shaft which projects in the direction that the digging is to proceed.

The "tunnel shield," as used in this case, is a large steel pipe, eight feet two and a half inches in diameter, made of quarter-inch steel. Projecting forward, the upper half of the circumference of the shield forms a lip. A part of the lower portion of the circumference of the pipe extends backward, at the rear, to form another lip. Between the two lips, is solid pipe. The inside of the shield and its forward lip are reinforced with steel ribs. In the interior there were to be two ten-inch, perpendicular "I" beams which were to be used as the forward base for the jacks to move the shield ahead through the ground, which, in this case, was described as "loose, running gravel." The theory of the shield is this: Once the shield is set in position on line and grade, it is pressed forward into the dirt by use of large hydraulic jacks pressing against the "I" beam jacking braces. By placing the jacks in different positions, the shield (so it was claimed, although disputed) could be controlled on line and grade. As the shield would progress, and the muck would be removed, steel tunnel liner plates were then to be bolted together inside the rear of the shield, thus forming a steel tunnel eight feet in diameter, extending from the rear of the shield to the initial portal. As the shield would be jacked forward, the overburden would rest on the tunnel liner plates. To move the shield forward, a series of the liner plates were to be coupled together and used as the rear base for the jacks, in order to spread the force of the jacking thrust.

The written contract does not specify that the tunnel shield was to be used. It is silent on the specific method to be used in tunneling. However, the evidence discloses that the shield was ordered by respondent from the Union Iron Works with appellant's knowledge; that it was billed to appellant; that appellant had knowledge of its installation; and that appellant objected to none of this.

Respondents assembled a crew. On Monday, May 15, 1950, they entered upon the performance of the contract. Appellant had already dug the first shaft and station. It was discovered that the shaft was off line and that the framing of the proposed portal to the tunnel, which had been bulkheaded to prevent the dirt from running, was not sufficiently large to accommodate an eight foot tunnel and hence would not permit entry of the eight foot two and one-half inch tunnel shield. Until the tunnel shield was delivered, respondents cleaned up and increased the size of that part of the station from which the tunnel was to be driven so that the tunnel shield might be installed and the bore made the size required by the prime contract. This was a complicated problem, since great care had to be taken to prevent slides and keep the ground braced at all times. They worked on the installation of required safety measures and did some work in another shaft, although hampered by lack of electricity and a hoist which appellants were to furnish.

Starting on May 24th, the shield was taken down the shaft in four sections and placed in position in such a manner as to go through the restricted station area. It was then sprung to its full width and bolted together. There was considerable dispute as to the position of the shield at the time the contract was terminated. The evidence, however, does not preponderate against the finding that it had been placed in position; that it had been almost completely assembled, except for the installation of a few bolts and the reinforcing of inner braces, and the welding of the "I" beams. The question of whether the shield was off line and grade and could not be put on line and grade (as appellant contends), or whether it had not yet been aligned because of appellant's failure to furnish the requested, necessary, and workable hydraulic jacks and jacking timbers (as respondents contend), was bitterly contested by the parties.

Respondents and their crew (which the time book discloses varied between six and eleven men) had worked *fourteen days,* when notice of termination of the contract

was served upon respondents. The notice, dated June 3, 1950, was served the morning of June 5th. It stated:

"This action is taken upon the grounds that (1) the General Contractor has determined that the cost of performing said work is exceeding the sum of $33.00 per lineal foot; (2) That you have shown yourselves utterly incapable of performing the work in a competent, workmanlike and efficient manner; (3) That you have overloaded the job with labor and with costs; (4) That you are not making any substantial progress whatsoever; (5) That you have failed to cooperate with the General Contractor."

The trial court found, and it is supported by the record, that Mr. Arcorace, general manager for appellant, had decided during the latter part of the week, between May 22nd and May 26th, to terminate the contract. His principal concern was that there was "no dirt coming out of the shaft."

Respondents, by letter of counsel dated June 7, 1950, demanded rescission of the notice of cancellation. They claimed that the cost per lineal foot was, at that time, incapable of determination. (Witnesses for both parties later established the fact that not one foot of tunnel had been completed.) Respondents denied the remaining charges made in the notice of termination and claimed affirmatively (1) that if the cost exceeded $33 per foot, it was due to unusual conditions encountered in performing the work (shaft out of line; station too small; safety measures to be installed; etc.); and (2) that appellant had failed to cooperate with them and had refused to furnish materials, equipment, and machinery necessary to perform the work (timbers, jacks, water, electric power, dry room, etc.) as required by the contract.

After termination of respondents' contract, appellant dug the tunnel. The tunnel shield was discarded and the "spiling" method of tunnel construction was used. The time required and the cost incurred exceeded the two hundred days and $159,060 maximum labor cost provided in respondents' contract.

To respondents' action for $48,000.06 for damages for loss of profit by reason of the alleged wrongful termination of

their contract, appellant cross-complained for $82,960, the amount its labor costs for driving the tunnel exceeded the maximum contract price.

Upon conflicting testimony, much of it from qualified, expert witnesses, the trial court found: (a) that respondents were qualified miners and tunnel men; (b) that the shield method employed by respondents was a recognized and feasible practice for tunnel construction under the existing conditions; (c) that respondents demanded, but appellant failed to supply, a sufficient number of heavy hydraulic jacks in workable condition to permit respondents to proceed with the work in accordance with the contract; (d) that respondents were forced, as a result of appellant's refusal, to use all types of improvised methods in their preparation to drive tunnel; (e) that, under the circumstances, respondents performed their duties in an efficient and workmanlike manner; (f) that the appellant did not afford the respondents a fair opportunity to proceed with the actual tunnel work; and (g) that

". . . the action of the defendant [appellant] in terminating the contract was premature. . . ."

The trial consumed one day less than the time respondents worked on the tunnel. The trial court allowed respondents twenty-eight thousand dollars damages and dismissed appellant's cross-complaint. There is no appeal from the judgment dismissing the cross-complaint.

■ We cannot say, in the face of the conflicting testimony directed to practically every issue, large or small, joined in the action, that the evidence preponderates against the findings of the trial court. Hence, appellant's assignments of error directed to the findings of fact, and to the conclusions of law that appellant breached the contract, are not well taken.

Appellant argues (assignment of error No. 20) that although the trial judge *refused to admit in evidence* an article on "Tunneling", appearing in the Encyclopedia Britannica, he did consider

". . . the article in question and his expressed views

on the use of tunnel shields was undoubtedly influenced by the article in question."

The issue of its admissibility is not before us.

Appellant does not direct our attention to the place in the record where the alleged influence is disclosed. The only reference we have found is a bracketed parenthetical sentence appearing in the judge's memorandum opinion wherein it is stated:

"(*While of no factual consideration,* it is interesting that Britannica Magazine covers several pages of illustration and subject matter as to operation of shields. . . .)" (Italics ours.)

It does not appear that the court was influenced by the article. In fact, the contrary is stated.

■ Appellant urges (assignment of error No. 19) that certain testimony, admitted over objection, varied the terms of the written contract. The evidence was not offered for that purpose, nor was it so considered by the trial court. The evidence fell within the bounds of the rule announced in *Vance v. Ingram,* 16 Wn. (2d) 399, 411, 133 P. (2d) 938 (1943):

"The court may always consider the surrounding circumstances leading up to the execution of an agreement, not to evidence an intent contrary to that expressed in the agreement, but to place the court in the same position as the parties. 3 Williston on Contracts (Rev. ed.) 1804, § 629; *Leavenworth State Bank v. Cashmere Apple Co.,* 118 Wash. 356, 204 Pac. 5."

See, also, *Skaug v. Gibbs,* 39 Wn. (2d) 269, 270, 235 P. (2d) 154 (1951).

Eight assignments of error challenge the sufficiency of the proof and the method of assessing damages adopted by the trial court.

■ Much of the evidence to support respondents' proof of damages was furnished by the testimony of respondent Kelly. His qualifications, competency, and good faith were vigorously attacked. Whether a witness is competent to express an opinion, depends largely upon the discretion and sound judgment of the trial judge. In his memorandum

opinion on appellant's motion for a new trial, the trial judge stated that by

". . . watching and hearing him [Kelly] testify and carefully studying his demeanor (for I quickly sensed the importance which would be urged for his testimony) I did not reach the conclusion that he was stupid, ignorant, dishonest or that he was trying to deceive the Court. After reconsidering his testimony in the light of argument my views as to his credibility have not changed. He did not claim to be an engineer or to have had any exactly similar employment. I believe he was alert and intelligent. He surely had had abundant experience in underground work."

The record does not support the conclusion that the trial court abused its discretion in permitting Mr. Kelly to testify concerning the estimated cost of completing the contract.

Although this is the first contract of this nature entered into by respondents, individually or as partners, the project was not a "new business" as that term is generally understood and used in the authorities cited by appellant. It was not necessary for respondents to prove, in order to recover damages, that their business had been in successful operation for such period of time as to give it permanence and recognition. The contract itself contains most of the elements necessary to fix damages for its breach. The work period of the contract was certain, two hundred days. The distance to be tunneled was fixed, 4,820 feet. The maximum cost or price was determined, thirty-three dollars per lineal foot. Union wage scales are in evidence to prove the cost of labor. The amount of labor necessary was established by the average number of miners to work on each heading. Competent testimony established the number of headings which would have been used to complete the tunnel. In addition, the trial court made several liberal adjustments, *in appellant's favor,* to include an increase in labor costs, the costs of removal of dirt, and several miscellaneous items. The computation was made in accordance with the provisions of paragraph No. 6 of the contract (quoted *supra*) between the parties.

It is difficult, at times, in determining damages in a

particular case, to ascertain the boundary between speculation and conjecture, and a reasonable method of estimation. However, no such difficulty is present here. The amount of respondents' damages for loss of profit was proved by competent evidence with reasonable certainty sufficient to place it within the rule announced in *Gaasland Company v. Hyak Lbr. & Millwork,* 42 Wn. (2d) 705, 713, 257 P. (2d) 784 (1953), wherein this court said:

"Since the basic function of the rule of certainty is to assure that one will not recover where it is highly doubtful that he has been damaged in the first instance (as where he claims loss of profits in a business which is not shown to have any established record of earnings), the jury does not commit forbidden speculation when, once the fact of damage is established, it is permitted to make reasonable inferences based upon reasonably convincing evidence indicating the amount of damage."

The same rule applies to the court sitting without a jury.

The aforegoing disposes of the assignments of error which are based upon the rulings on the post trial motions.

The judgment is affirmed.

GRADY, C. J., MALLERY, HILL, and OLSON, JJ., concur.

---

January 12, 1954. Petition for rehearing denied.